**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| JACKSON ISAACSON, individually and on behalf of all others similarly situated,<br><br>PLAINTIFF<br><br>v.<br><br>SONESTA INTERNATIONAL HOTELS CORPORATION,<br><br>DEFENDANT | ) | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**[JURY TRIAL DEMANDED]** |

Plaintiff Jackson Isaacson ("Plaintiff" or "Mr. Isaacson"), individually and on behalf of all others similarly situated (the "Class" or "Class Members"), through his counsel, brings this action against defendant Sonesta International Hotels Corporation, ("Sonesta" or "Defendant"), based upon personal knowledge and, upon information and belief, including from his counsel's investigation. Mr. Isaacson seeks monetary damages, injunctive relief, and/or all appropriate equitable remedies.

## I. NATURE OF THE ACTION

1. Starting around 2021, Sonesta International Hotels Corporation ("Sonesta")[1] began systemically cheating consumers out of tens of millions of dollars each year by falsely advertising its hotel room rates.

2. Rather than disclosing the full cost of its hotel rooms upfront, Sonesta instead advertised a certain rate, then added on last-minute "destination fees," "resort fees," and other similar charges that were really part of the nighty room rate.

[1] The term "Sonesta" refers to the Defendant Sonesta International Hotels Corporation and the hotels that it owns or franchises, inclusive of all brands.

3. The goal of Sonesta's false advertising was to convince consumers shopping for a hotel room that a Sonesta room was cheaper than it was.

4. These fees—commonly called "Junk Fees," including by the Federal Trade Commission ("FTC")[2]—have been the subject of national media attention, including during President Biden's 2023 State of the Union Address. As President Biden explained, "too many companies" are charging "hidden surcharges . . . to make you pay more. . . . [J]unk fees may not matter to the very wealthy, but they matter to most other folks in homes like the one I grew up in, like many of you did. They add up to hundreds of dollars a month. They make it harder for you to pay your bills[.]"[3]

5. In 2024, the FTC adopted a rule that declared Junk Fee practices, like those used by Sonesta, to be deceptive.

6. Indeed, in 2017 alone, the Junk Fee revenue of the U.S hotel industry was approximately $2.7 billion.[4]

7. Junk Fee practices—like Sonesta's—are not just greedy and deceptive. They are illegal.

8. Mr. Isaacson brings this action under the Massachusetts General Law ch. 93A to stop Sonesta from falsely advertising hotel room rates and to force Sonesta to pay back the tens of

[2] As defined by the FTC, "Junk Fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer" or fees that are "hidden," such as those disclosed only at a later stage in the consumer's purchasing process or not at all." *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (codified at 16 C.F.R. pt. 464), *available at* https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-fees-trade-regulation-rule-commission-matter-no-r207011 (cleaned up).

[3] "Read Biden's Full 2023 State of the Union Remarks," News Desk, PBS News, (Feb. 8, 2023), *available at* https://www.pbs.org/newshour/politics/read-bidens-full-2023-state-of-the-union-remarks (last visited Jan. 15, 2026).

[4] S. Santana et al., "Consumer Reactions to Drip Pricing," 39 Marketing Science 188, 189, *available at* https://ssrn.com/abstract=3924320 (last visited Jan. 15, 2026).

millions of dollars in unlawful Junk Fee revenues it has taken from consumers together with statutory penalties and punitive damages.

## II. PARTIES

9. Plaintiff Jackson Isaacson is a natural person and is a resident of New York.

10. Plaintiff Isaacson is a Sonesta Travel Pass rewards member. He has been a Travel Pass rewards member at all times relevant to his claims.

11. Defendant Sonesta International Hotels Corporation is a multinational hospitality company that owns, manages, and franchises a broad portfolio of hotels and lodging facilities throughout the United States and abroad. It is incorporated in Maryland and headquartered in Newton, Massachusetts.

12. Hotel brands operated by Sonesta include, but are not limited to, The Royal Sonesta, The James Hotels, Classico, Sonesta Hotels and Resorts, MOD, Sonesta Select, Sonesta Essential, Sonesta Suites, and Sonesta Simply Suites, Sonesta Cruise Collection, and Sonesta

## III. JURISDICTION AND VENUE

13. This Court has original subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (i) the amount in controversy exceeds $5 million, exclusive of interest and costs; (ii) the number of class members exceeds 100, and (iii) minimal diversity exists because many class members, including Plaintiff, have different citizenships from the Defendant.

14. This Court has general personal jurisdiction over Sonesta because it maintains its principal place of business in Massachusetts.

15. This Court has specific personal jurisdiction over Sonesta because it has purposefully availed itself of the laws, rights, and benefits of the Commonwealth of

Massachusetts. Sonesta has engaged in activities including (i) providing services throughout the United States from this judicial district; (ii) conducting substantial business in this forum; and/or (iii) engaging in other persistent courses of conduct and/or deriving substantial revenue from services provided in Massachusetts and in this judicial District.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendant is based in this District, coordinate the purchase flow in this District, and have caused harm to Plaintiff and the Class Members in this District.

## IV. FACTUAL ALLEGATIONS

### A. Advertising Deceptively Low Prices Upfront Only to Add a Fee at the End Is Inherently Deceptive and Unfair

17. Last minute, mandatory fees like those charged by Sonesta are called "junk fees" by the Federal Trade Commission ("FTC").[5] This type of Junk Fee pricing strategy has been referred to as "bait and switch" advertising, and is effected by the use of partitioned pricing, or "drip pricing," where only the initial low price is shown until the end of the transaction when the true cost inclusive of fees is revealed.

18. The use of deceptively low prices with added junk fees at the end of the transaction is inherently unfair, was condemned by the White House in 2024, and has been explicitly outlawed by state legislatures in several states in recent years.

[5] As defined by the FTC, "junk fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer including goods or services that consumers would reasonably assume to be included within the overall advertised price" or fees that are "hidden," such as those "disclosed only at a later stage in the consumer's purchasing process or not at all." *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (codified at 16 C.F.R. pt. 464), *available at* https://perma.cc/CLQ6-YYQS (cleaned up).

19. As President Biden explained in his 2024 State of the Union address, "junk fees may not matter to the very wealthy, but they matter to most other folks in homes like the one I grew up in, like many of you did. They add up to hundreds of dollars a month. They make it harder for you to pay your bills[.]"

20. In fact, the White House estimated that junk fees cost Americans over $90 billion each year.[6]

21. Large, sophisticated companies—like Sonesta—with large, sophisticated marketing departments know that Junk Fees trick consumers into paying more for a good or service.

22. One of the most common Junk Fee pricing techniques is partitioned or "drip pricing," where a company uses a deceptively low price to entice the consumer to enter the transaction and then does not disclose the total price of a product or service until late in the purchase process—after the consumer has already decided to buy based on the deceptively low price advertised at the outset.

23. Consumers who are not provided the complete price until checkout are likely to proceed with their purchase even after the Junk Fee is revealed because they have already factored the deceptively low price into their decision and built purchasing commitment as they clicked through the transaction. Because of Sonesta's deceptively low advertised prices, which do not include fees, and because the process of clicking through the transaction builds purchasing

[6] *Readout of White House State Legislators Convening on Junk Fees*, White House (April 24, 2024), *available at* https://web.archive.org/web/20250106193703/https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/24/readout-of-white-house-state-legislators-convening-on-junk-fees/ (archived screenshot of White House statement; original statement is no longer accessible).

commitment, consumers proceed with the transaction even after exorbitant and unpredictable fees have been added despite their better judgment—despite the fact that continuing to search for cheaper prices would be more "optimal"—because consumers want to avoid "the cost of the time and cognitive effort involved" in continuing to search for a product or service.[7]

24. Once a consumer decides what to buy, she is unlikely to depart from that decision because of the "additional cognitive effort" involved in resuming her search.[8]

25. In other words, omitting Junk Fees from the advertised cost of a product or service through partitioned pricing induces consumers to buy based on deceptively low prices such that at the end of the purchase flow, which is designed to build their commitment to purchase with each click, consumers pay higher total prices than they otherwise would.

26. Indeed, as companies that engage in Junk Fee practices are aware, consumers choose products or services based on the advertised "base price," and not based on the price inclusive of fees, which is obscured by partitions in the purchase flow.[9]

27. Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip prices . . . consumers more frequently fail to identify the cheapest offer."[10]

28. In fact, studies show that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake

[7] Mary W. Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16–17, https://perma.cc/A4GT-NUW7.
[8] *Id*. at 17.
[9] Alexander Rasch et al., *Drip Pricing & Its Regulation: Experimental Evidence*, 176 J. Econ. Behavior & Org. 353 (2020), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("[B]uyers . . . . based their purchase decision exclusively on the base price").
[10] *Id*.

by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[11]

29. As the FTC's Bureau of Economics has explained, the use of deceptively low prices at the outset of transactions while hiding Junk Fees until the end of the transaction adds steps to the process of determining the actual price of a good or service, which forces consumers to pay more than they would if initially presented with full, complete prices.[12]

30. As a result, when they reach the end of the transaction after they have already factored the low price into their decisions and built purchasing commitment as they clicked through the process, consumers are forced either to "incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly [purchase], or both."[13]

31. The FTC has thus characterized Junk Fees as especially egregious when they are hidden (i.e., "disclosed only at a later stage in the consumer's purchasing process or not at all"), because openly disclosed Junk Fees would enable consumers to determine that the cost of a given product or service is not favorable relative to the cost charged by competitors and choose to do business elsewhere.[14]

---

[11] Santana, *supra*, n.4, 189–90.
[12] Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, *supra* n.7 at 2–3.
[13] *Id.* at 4; *see also* David Adam Friedman, *Regulating Drip Pricing*, 31 Stan. L. & Pol'y Rev. 51, 67 (2020) ("[S]ellers provide buyers with the 'initial value' in the form of the initially-presented base price. . . . Buyers are influenced by the initial value, so a lower base price would create the impression of a lower overall price." (citing Gorkan Ahmetoglu et al., *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behaviour*, 21 J. Retailing & Cons. Services 696, 697 (2014))).
[14] *See, e.g.*, *Unfair or Deceptive Fees Trade Regulation Rule*, *supra* n.5 ("After a market leader took unilateral action to phase out hidden fees, the platform 'lost significant market share and abandoned the policy after a year because consumers perceived the platform's advertised prices to be higher than its competitors' displayed prices.'" (citation omitted)).

32. Given this, it is no surprise companies are motivated to use deceptively low prices at the outset while hiding Junk Fees through drip pricing for as long as possible in the search and purchase process, as duping consumers into paying Junk Fees—by advertising artificially low prices and forcing users through a partitioned purchase flow—generates substantial revenue.

33. In many instances, companies keep the advertised price at the outset artificially low and pass some of the cost of the item into the Junk Fee that consumers do not see until the end, instead of adding the increased cost of the item to the low advertised price at the outset, which would deter consumers from being lured into the purchase flow. This allows companies to compound the benefit they obtain through these practices by increasing Junk Fees at a higher rate than they increase the base price of the underlying product or service itself.[15] As a result, the product or service appears cheaper to consumers than competitors' products or services, even though the total cost of the product or service, inclusive of Junk Fees is equally, if not more, expensive than those other companies' products or services.[16]

34. Companies are also able to increase hidden Junk Fees without suffering meaningful market consequences.[17] In particular, companies can charge excessive Junk Fees in part because drip pricing impedes fair, honest, and free market competition as they are not adequately disclosed alongside the base price.[18]

35. Hence, by using a deceptively low price while hiding the true cost of items inclusive of Junk Fees, companies can charge excessive Junk Fees while skirting economic

---

[15] *Id.*
[16] *See id.*
[17] Rasch, *Drip Pricing & Its Regulation: Experimental Evidence*, *supra* n.9.
[18] *Id.* ("[F]irms fiercely compete in base prices but not in drip prices," so "total price increases when firms use drip pricing").

consequences, as shrouding the fee encourages consumers to make their purchasing decisions based on only the base price, not inclusive of Junk Fees.

36. Meanwhile, competitor companies and consumers face the consequences. Companies that advertise deceptively low advertised prices that do not include hidden Junk Fees will lure consumers away from properly behaving competitors that do not engage in such practices (and thus appear to charge higher prices) and will earn more profit than those competitors.[19]

37. Using deceptively low prices and then later adding hidden Junk Fees also generates significant burden for individual consumers, who "pay upward of twenty percent more [when a company engages in drip pricing] than when the actual price was disclosed upfront."[20]

38. By concealing the actual price of hotel rooms, companies like Sonesta force consumers to spend "additional time" comparison shopping for rooms than they otherwise would. *Kahn v. Walmart Inc*., 107 F.4th 585, 601 (7th Cir. 2024). The additional time spent researching room prices is a cognizable injury. *See*, *e.g*., *id*. ("Bait-and-switch pricing schemes like the one alleged here lead to injuries that consumers cannot reasonably avoid, which come in the form of higher prices and search costs." (quotation marks omitted)).

39. Moreover, the conduct of drip pricing runs afoul of the FTC Act itself. *See* 15 U.S.C. § 45(a)(1) (declaring unlawful "unfair or deceptive acts or practices in or affecting commerce").

---

[19] *Id.* ("[W]here there is uncertainty about the drip size, sellers with a high drip-price limit can earn profits above the competitive level.").

[20] *See Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, *supra* n.5 (explaining that hidden junk fees therefore "impose substantial economic harms on consumers").

40. The FTC's guidance on bait and switch advertising has long stated that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a).

41. More recently, the FTC's Trade Regulation on Unfair or Deceptive Fees, which took effect in May 2025, "specifies that it is an unfair and deceptive practice for businesses to offer, display, or advertise any price of live-event tickets . . . without clearly, conspicuously and prominently disclosing the total price," authorizing the FTC to seek civil penalties against companies that violate the FTC Act in this way.[21]

42. Put simply, advertising an artificially low price at the outset to lure consumers into the transaction while adding on exorbitant and variable Junk Fees at the very end is bad for consumers and is bad for competition.

**B. <u>Sonesta's Conduct Giving Rise to Plaintiff's Claim</u>**

43. This action was commenced after years of Sonesta deceiving customers about the rates of its hotel rooms.

44. Sonesta did not include Junk Fees in its advertised hotel room prices regardless of whether the consumer was reserving a room by paying U.S. Dollars or redeeming Travel Pass rewards points. By doing so, Sonesta misrepresented and concealed the actual cost of its rooms, deceiving consumers and tricking them out of their hard-earned money.

[21] FTC, "Trade Regulation Rule on Unfair or Deceptive Fees" Summary, *available at* https://www.federalregister.gov/documents/2025/01/10/2024-30293/trade-regulation-rule-on-unfair-or-deceptive-fees.

45. For instance, when a consumer searched for a hotel on Sonesta's website, Sonesta's practice was to initially advertise a room rate that excludes Junk Fees, but then to add Junk Fees into the final charges a consumer is required to pay.

46. Even when a consumer selected a particular hotel on Sonesta.com, Sonesta still did not disclose the total nightly price when the customer was given the option to select their room type.

47. Sonesta charged these additional Junk Fees, which can exceed $40 per day at Sonesta properties, to increase its revenues without appearing to raise the room rate at its hotels.

48. When consumers searched for and sought to reserve a hotel room using Sonesta's online reservation system, Sonesta provided the consumers with a quoted room rate and allowed consumers to see the price, but there was no mention of an additional mandatory Junk Fee.

**a. <u>Sonesta Travel Pass Rewards Program</u>**

49. Sonesta offers consumers a loyalty rewards program known as Travel Pass.

50. Consumers who sign up for the Travel Pass rewards program receive certain benefits, such as "earn[ing] reward points towards free[22] nights," discounted nightly room rates, and certain other benefits.[23]

51. To become a Travel Pass rewards member, consumers must sign up and agree to the Sonesta Travel Pass Terms and Conditions. The Terms and Conditions provide:

> This Program and these Terms and Conditions shall be governed by, construed, and interpreted under the laws of the Commonwealth of Massachusetts. The Federal and State courts of the Commonwealth of Massachusetts shall be the exclusive

[22] Sonesta advertises the benefits of signing up to be a Travel Pass rewards member to include earning points toward "free nights." However, as Plaintiff Isaacson experienced, even if Travel Pass members had the requisite number of Travel Pass reward points, Sonesta would still charge mandatory fees, making this statement a separate, and actionable misrepresentation.

[23] "Sonesta Travel Pass: Member Tiers," *available at* https://core.redlion.com/sites/default/files/2024-04/stp_memberperks_website_8.5x11_v5_031424.pdf.

court of jurisdiction in the first instance for any disputes regarding these Terms and Conditions.

52. Sonesta has operated the Travel Pass rewards program at all times relevant to this lawsuit. The choice-of-law and choice-of-venue provisions have remained substantially unchanged through all times relevant to this lawsuit.

**b. <u>Junk Fees on the Sonesta Website.</u>**

53. When Sonesta's purchase flow used an artificially low price at the outset that did not include added Junk Fees until the end of the transaction, consumers were drawn into the purchase flow by deceptively low prices. Consumers then only had the artificially low advertised price to factor into their decision making while they had to click through multiple screens before they found out the true price inclusive of Junk Fees.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

54. For example, when a Travel Pass rewards member searched for a hotel room in the District of Columbia, the Travel Pass rewards member received a variety of potential hotel options from within the Sonesta family of brands with purported per night (i.e., "/Night") pricing information:




55. The initial advertisement did not provide any indication as to whether a particular hotel is a "Junk Fee hotel," i.e., a hotel engaging in drip and/or partitioned Junk Fee practices.

56. Some hotels do not charge Junk Fees, and thus, for those hotels, the advertised per night price was correct.

57. However, for Junk Fee hotels, the advertised price was not correct. When a Travel Pass rewards member navigated to reserve a room at a Junk Fee hotel, the transaction could not be completed for the advertised price.

58. For example, as shown, the advertised average price for the Royal Sonesta Washington DC Dupont Circle was $189 per night.

59. When the Royal Sonesta Washington DC Dupont Circle was selected, the Travel Pass rewards member was taken to the next page on which Sonesta extolled the virtues of the hotel including its awards, location, dining options, and meeting spaces and wedding venue options. The consumer was invited to take a visual tour through the photo gallery of the "upscale," "boutique" hotel located in the "cosmopolitan Dupont Circle neighborhood." The consumer could explore the nearby area with an interactive map, complete with 28 different landmarks to choose from to see the precise distance from the hotel to the landmark.

//

//

//

//

//

//

//

//

//

//

//

//

//

60. The Travel Pass rewards member was also presented with several different room types and their corresponding price from which to choose. Pertinent for this example was the "Deluxe – Queen" room for the advertised price for $189:




61. When the Travel Pass rewards member clicked the "SELECT ROOM" button for the "Deluxe – Queen" room for the advertised price of $189, she was then taken to the "Guest Details" page. The Travel Pass rewards member was required to sign in to her account or to input her name, phone number, and email address. Then, Sonesta, once again, asked the Travel Pass rewards member to "Select a Rate" and presented the Travel Pass rewards member with the advertised rate of $189 per night, as well as the option for add-on products at a higher rate. When the Travel Pass rewards member selected for the *third* time the advertised rate of $189 per night, she was presented with a "Total For Stay" of $253.94. The total price amount was prominently presented in large-size bold font. Underneath the total price, Sonesta reiterated the advertised price of $189 and included in unbolded font, which was difficult to read and was approximately

one-third the font size of the total price, a line-item for "Taxes & Fees" of $64.94. There was still no indication to the consumer that the "Taxes & Fees" amount includes the unadvertised Junk Fee rather than mandatory governmental taxes and fees:




//

//

//

//

//

//

//

//

//

//

62. Only if the Travel Pass rewards member clicked the "EXPAND PRICE DETAILS" button would she be presented with the information that the $64.94 for Taxes & Fees consists of $30.15 of D.C. occupancy taxes assessed on the advertised price, and a "Destination Fee" of $34.79[24]. This information too is presented in the small, difficult to read, and non-bold font:




//

//

//

//

//

//

//

//

//

//

//

//

//

[24] The total for the destination fee was $34.79 because this included a $30.00 destination fee charge taxes assessed on charge at the D.C. transient accommodations tax rate. D.C. Code § 47-2002.2.

63. When the Travel Pass rewards member continued to the next page to enter her payment information, she was presented with the total price of $253.94, with the destination fee once again concealed unless the Travel Pass rewards member clicked "EXPAND PRICE DETAILS":




64. Based on this practice, a Travel Pass rewards member could complete the entire transaction without Sonesta ever disclosing to her that the total price includes an unadvertised, but mandatory Junk Fee.

65. A Travel Pass rewards member had no way to purchase the hotel room stay with Sonesta without incurring this additional fee of $34.79 and, as a result, had no ability to complete the hotel reservation transaction for the advertised price of $189 per night.

66. Also, because of Sonesta deceptive Junk Fee practices, a Travel Pass rewards member could not reasonably compare the total price of a room against the price of other rooms at Sonesta and other hotel companies.

**c. <u>Sonesta's deceptive practices prevented Travel Pass rewards members from comparing prices.</u>**

67. Sonesta's deceptive Junk Fee advertising stood in stark contrast to the practices of some of Sonesta's competitors at the time. Indeed, other hotel chains, such as Marriott, had stopped using drip pricing long before Sonesta.

68. Take for example, Marriott's advertisement to book a room at the Mayflower Hotel in Washington, D.C when compared to Sonesta Junk Fee practices. Unlike Sonesta, Marriott displayed a complete advertised price of $205 per night which it says *includes* a $25 "destination amenity fee."

69. Marriott Mayflower:




70. Sonesta included no such disclosure:




//

//

//

//

71. Based on these two advertisements, a Travel Pass rewards member would have expected to pay at least $16.00 per night *less* if she selected the Royal Sonesta rather than the Mayflower. But in fact, if the Travel Pass rewards member had purchased the room at the Royal Sonesta, she would have paid $16.24 *more*! The total price at the Mayflower was $237.70, but the Royal Sonesta was $253.94.

72. Marriott Final Price at checkout:

RATE DETAILS

| 1 room(s) for 1 night(s) | Prices in USD |
|---|---|
| Friday, August 25, 2023 | 180.00 |
| Total cash rate | 180.00 |
| Destination Fee | 25.00 |
| Estimated government taxes and fees | 32.70 |
| **Total Stay** | **237.70** USD |

73. Sonesta Final Price at checkout:

The Royal Sonesta Washington DC Dupont Circle

| | |
|---|---|
| **Total For Stay** | **$253.94** |
| | 1 Night : $189.00 |
| | Taxes & Fees: $64.94 |
| EXPAND PRICE DETAILS | |

74. From the onset of the search process, consumers on Marriott.com were able to compare accurate total prices across hotels in order to make an informed choice as to which room and company was right for them.

75. However, Sonesta's Travel Pass rewards members were not so fortunate because Sonesta never intended to, nor did, reserve rooms at their advertised price. Sonesta's practices induced Travel Pass rewards members to undertake the search and cognitive effort to pick a hotel

or room. Only then, after the Travel Pass rewards member had spent valuable time and effort and psychologically committed to a hotel, including selecting the advertised price on three separate occasions, was the Travel Pass rewards member appraised of the actual total price.

76. Sonesta's Junk Fees practices gave it an unfair advantage over competitors who properly advertised the full price of the room.

77. As shown by the foregoing example, Sonesta's deceptive purchase flow took advantage of Travel Pass rewards members' known focus on the artificially low initially advertised price that did not include Junk Fees. Sonesta effectively prevented Travel Pass rewards members from comparing prices across different platforms and making an informed choice about where to book their room. Indeed, Sonesta used these deceptive tactics to ensure that Travel Pass rewards members became invested in the decision to reserve rooms and got swept up in the momentum of events such that Travel Pass rewards members still completed their purchases on Defendant's platform, even as it added hefty fees at the very end of the transactions. In other words, Sonesta employed deceptive and unfair "digital dark patterns" that have the effect of obscuring, subverting, and impairing consumer autonomy and decision-making when booking rooms, resulting in harm to Travel Pass rewards member.[25]

[25] Fed. Trade Comm'n, *Bringing Dark Patterns to Light*, Staff Report (September 2022), *available at* https://perma.cc/L8TS-77LC (finding that "[s]ome dark patterns manipulate consumer choice by inducing false beliefs", including the use of "countdown timers on offers that are not actually time-limited, claims that an item is almost sold out when there is actually ample supply, and false claims that other people are also currently looking at or have recently purchased the same product."); *see also id.* at 9 ("Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction, after the consumer already has spent significant time selecting and finalizing a product or service plan to purchase.").

### C. **Plaintiff Isaacson's experience using Sonesta's purchase flow.**

78. Plaintiff Isaacson is a Sonesta Travel Pass rewards member. He has been a Travel Pass rewards member at all times relevant to his claims.

79. When signing up to become a Sonesta Travel Pass rewards member, Plaintiff Isaacson agreed to the Sonesta Travel Pass Terms and Conditions. The Sonesta Travel Pass Terms and Conditions provide that by agreeing to the Terms, Travel Pass members and Sonesta agree that disputes "shall be governed by, construed, and interpreted under the laws of the Commonwealth of Massachusetts[,]" and that "[t]he Federal and State courts of the Commonwealth of Massachusetts shall be the exclusive court of jurisdiction in the first instance for any disputes regarding these Terms and Conditions."

80. On or about February 17, 2023, Plaintiff Isaacson booked a hotel room at the Nautilus Sonesta Miami Beach through Sonesta's website. The purchase totaled approximately $1,748.40.

81. Sonesta did not initially advertise a price that included all mandatory fees.

82. Sonesta initially advertised room as costing approximately $466 per night ($1,398.68 in total).

83. Sonesta charged Plaintiff Isaacson $135.00 in added fees ($45.00 per night), which were not initially disclosed, and $214.72 in taxes.

84. Plaintiff Isaacson was not aware that the room included $135.00 in additional taxable fees when he first selected the room.

85. The initially advertised price of $466 per night was a substantial factor in Plaintiff Isaacson's decision to book the room.

86. As a result of the pressure exerted by Sonesta in its purchase flow as described herein, Plaintiff Isaacson booked the room despite the addition of the previously undisclosed fees.

87. If Plaintiff Isaacson had known that the $45.00 Destination Fee was in fact just a secret profit-generator, he would not have paid the charge if there were a viable option to reserve the room without incurring it.

88. Plaintiff Isaacson paid more for the room than he otherwise would have as a result of Sonesta's practices described herein, including luring him in with deceptively low initial prices and building purchasing commitment with that initial price in mind.

89. On or about February 17, 2023, Plaintiff Isaacson booked a hotel room at the Nautilus Sonesta Miami Beach through Sonesta's website. The purchase totaled approximately $4,040.41.

90. Sonesta did not initially advertise a price that included all mandatory fees.

91. Sonesta initially advertised room as costing approximately $1,727 per night ($3,454.22 in total).

92. Sonesta charged Plaintiff Isaacson $90.00 in added fees ($45.00 per night), which were not initially disclosed, and $496.19 in taxes.

93. Plaintiff Isaacson was not aware that the room included $90.00 in additional taxable fees when he first selected the room.

94. The initially advertised price of $1,727 per night was a substantial factor in Plaintiff Isaacson's decision to book the room.

95. As a result of the pressure exerted by Sonesta in its purchase flow as described herein, Plaintiff Isaacson booked the room despite the addition of the previously undisclosed fees.

96. If Plaintiff Isaacson had known that the per night $45.00 Destination Fee was in fact just a secret profit-generator, he would not have paid the charge if there were a viable option to book the room without incurring it.

97. Plaintiff Isaacson paid more for the room than he otherwise would have as a result of Sonesta's practices described herein, including luring him in with deceptively low initial prices and building purchasing commitment with that initial price in mind.

98. A year and a half later, around June 2024, Plaintiff Isaacson booked a hotel room at the Nautilus Sonesta Miami Beach through Sonesta's website using Travel Pass rewards points. After applying his Travel Pass rewards points, the purchase totaled approximately $173.88.

99. Sonesta did not initially advertise a price that included all mandatory fees.

100. Despite the room appearing to be free after application of a certain number of Travel Pass rewards points, Sonesta charged Plaintiff Isaacson $147.00 in added fees ($49.00 per night) that were not initially disclosed, and $26.88 in taxes.

101. Plaintiff Isaacson was not aware that the room he booked using Travel Pass rewards points included $147.00 in additional taxable fees when he first selected the room.

102. The initially advertised offer that his Travel Pass rewards points would cover the cost of a stay at the Sonesta property was a substantial factor in Plaintiff Isaacson's decision to book the room.

103. As a result of the pressure exerted by Sonesta in its purchase flow as described herein, Plaintiff Isaacson booked the room despite the addition of the previously undisclosed fees.

104. If Plaintiff Isaacson had known that the $49.00 Destination Fee was in fact just a secret profit-generator, he would not have paid the charge if there were a viable option to book the room without incurring it.

105. Plaintiff Isaacson paid more for the room than he otherwise would have as a result of Sonesta's practices described herein, including luring him in with deceptively low initial prices and building purchasing commitment with that initial price in mind.

### D. <u>Sonesta's purchase flow was designed with dark patterns to interfere with consumer decision making to ensure reliance on the deceptively low advertised price.</u>

106. Sonesta used "dark patterns" to ensure that when Travel Pass rewards member reached the final screen, the momentum of events would pressure Travel Pass rewards members to purchase despite the addition of exorbitant fees to the total price of the hotel room. Sonesta's dark patterns ensured that Travel Pass rewards members had already decided to book rooms based on the artificially low price advertised at the outset and throughout the transaction. Sonesta's dark patterns—online practices that tricked or manipulated consumers into making choices that they would not have otherwise made—included:

a. **<u>Obstruction</u>**: Sonesta prevented Travel Pass rewards member from comparing prices because the overall amount was hidden behind multiple stages of the transaction, including after the consumer had signed in or provided personally identifying information;

b. **<u>Information Hiding</u>**: Sonesta hid the true price of its rooms until users had built purchasing commitment through multiple steps in the transaction, finally disclosing the true price by adding opaquely denominated "Taxes and Fees." Even after getting to the final page, the amount of fees was hidden in a dropdown list that was only visible if the consumer inquired as to the change in price;

c. **Interface Interference**: Sonesta used style and design, including small font sizes and dropdown lists, to distract and misdirect attention from the true amount of Junk Fees disclosed only at the very end of the transaction;

d. **Coerced Action**: Sonesta forced registration prior to disclosing the true price of the room by requiring users to provide contact information and to sign in or sign up, further inhibiting Travel Pass rewards members' ability to price compare.

107. Sonesta's use of dark patterns has benefited it through the collection of inadequately disclosed Junk Fees and has deprived consumers of the ability to make informed purchasing decisions.

108. Adding to the confusion, there does not appear to be any standardization for how Junk Fees were set. As explained in the examples above, Sonesta has charged Destination Fees of $30.00, $45.00, and $49.00. *See*, *supra*, ¶¶ 15, 24, 32, 89 n.24. A Travel Pass rewards member had no way of anticipating what the Junk Fee would be prior to clicking through the entire purchase flow.

## V. CLASS ACTION ALLEGATIONS

109. Plaintiff brings this action on his own behalf and on behalf of all natural persons similarly situated, as referred to throughout this Complaint as "Class Members."

110. Pursuant to Fed. R. Civ. P. 23, Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> All Sonesta Travel Pass rewards members who, from October 24, 2021, to the present, paid a Destination Fee, Resort Fee, or other similar fee to Sonesta through the desktop or mobile versions of https://www.sonesta.com or through the Sonesta mobile application where the price initially displayed to the consumer did not include the amount of such fee.

111. Excluded from the Class are Sonesta's officers, directors, and employees; any entity in which Sonesta has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Sonesta. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

112. **Numerosity.** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, Sonesta claims there are "over 7 million members worldwide."[26]

113. **Commonality.** Sonesta has acted or refused to act on grounds that apply generally to the Class. Absent certification of the Class, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on Sonesta. Numerous common issues of fact and law exist, including, without limitation:

a. Whether Sonesta's advertising, or causing of advertising by third parties, of prices and room rates for lodging in their hotels that did not include Junk Fees constitute a violation of Mass. Gen. Laws. Ch. 93A § 2;

b. Whether Sonesta clearly indicated the exact product being offered for sale at the advertised price in its advertising, 940 Mass. Code Regs. § 3.05(2);

c. Whether Sonesta's advertising, or causing of advertising by third parties, of prices and room rates for lodging in their hotels that did not include Junk Fees was a bona fide effort to sell the rooms as advertised, 940 Mass. Code Regs. § 3.02(1);

d. Whether Sonesta's advertising, or causing of advertising by third parties, of prices and room rates for lodging in their hotels that did not include Junk Fees created a false impression of the grade, quality, make, or value of the good or service being offered, 940 Mass. Code Regs. § 3.02(2);

e. Whether Sonesta's advertising, or causing of advertising by third parties, of prices and room rates for lodging in their hotels that do not include Junk Fees misrepresented the room in such a manner that later, on disclosure of

[26] "Loyalty Program," Sonesta RL Franchising, Inc., *available at* https://perma.cc/Q7GQ-NJ8B/ (last accessed Jan. 10, 2026).

the true facts, there was a likelihood that the Travel Pass rewards member may have switched from the advertised product to another, 940 Mass. Code Regs. § 3.02(2);

f. Whether Sonesta refused to show, demonstrate, or sell its hotel rooms in accordance with the terms of the offer when it advertised prices and room rates for lodging in their hotels that did not include Junk Fees, 940 Mass. Code Regs. § 3.02(3)(a);

g. Whether Sonesta made claims or representations regarding its rooms that directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving Travel Pass rewards members in any material respect, 940 Mass. Code Regs. § 3.05(1);

h. Whether Sonesta made a claim or representation to Travel Pass rewards members that had the capacity or tendency or effect of deceiving members as to the value or the past, present, common or usual price of a product, 940 Mass. Code Regs. § 3.04;

i. Whether Sonesta represented or implied, in advertising or otherwise, that its hotel rooms could be purchased for a specified price when such was not the case, 940 Mass. Code Regs. § 3.13(2);

j. Whether Sonesta failed to disclose to its Travel Pass rewards members any fact, the disclosure of which may have influenced any members' decision not to enter into the transaction, 940 Mass. Code Regs. § 3.16(2);

k. Whether Sonesta's advertising, or causing of advertising by third parties, of prices and room rates for lodging in their hotels that do not include Junk Fees violates the Federal Trade Commission Act, 15 U.S.C. § 45; 940 Mass. Code Regs. § 3.16(4);

l. Whether Sonesta representing Junk Fees as among "Taxes & Fees" is an unlawful trade practice under ch. 93A; and

m. Whether Plaintiff and the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

114. **Typicality.** Plaintiff's claims are typical of those of the Class Members because Plaintiff used Sonesta's publicly accessible website and booked his room through a purchase flow substantially similar to the purchase flow shown above, like that of every Class Member.

115. **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of Class Members, including those from states and jurisdictions where he

does not reside. Plaintiff's Counsel are competent and experienced in litigating class actions and have been appointed lead counsel by many different courts in many other class action suits.

116. **Predominance.** These common issues predominate over individualized inquiries in this action because Sonesta's liability can be established as to all members of the Class as discussed herein.

117. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for LastPass. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

## VI. CAUSES OF ACTION

### COUNT I
### (VIOLATION OF MASS. CONSUMER PROTECTION ACT, MASS. GEN. LAWS ANN. CH. 93A, § 1 *ET SEQ.*)
### (On behalf of Plaintiff Isaacson and the Class)

118. Plaintiff and the Proposed Class Members incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

119. The Massachusetts Consumer Protection Act ("MCPA") protects consumers against "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws Ann. ch. 93A, § 2(a).

120. "Under Chapter 93A, an act or practice is unfair if it falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness'; 'is immoral, unethical, oppressive, or unscrupulous'; and 'causes substantial injury to consumers.'" *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016) (citing *PMP Assocs. v. Globe Newspaper Co.*, 321 N.E.2d 915, 917 (Mass. 1975)). An act or practice is deceptive pursuant to Chapter 93A "if it possesses a tendency to deceive and if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted," *Walsh*, 821 F.3d at 160 (citing *Aspinall v. Philip Morris Cos., Inc.*, 813 N.E.2d 476, 486–87 (Mass. 2004)) (quotation marks omitted).

121. Under ch. 93A, the determination of whether a trade practice is deceptive is "guided by the interpretations given by the Federal Trade Commission." Mass. Gen. Laws ch. 93A § 2. The FTC has ruled that drip pricing practices, like those used by Sonesta, are unfair and deceptive. 16 C.F.R. pt. 464.

122. Chapter 93A further provides that "[a]ny person . . . who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by . . . any rule or regulation issued thereunder . . . may bring an action." *Id.* § 9(1). The Attorney General has promulgated several regulations pursuant to ch. 93A. Sonesta's practice of partitioning its mandatory Junk Fees from the advertised prices of its hotel rooms violates several rules and regulations, including, but not limited to:

A. 940 Mass. Code Regs. § 3.02(1) ("No advertisement containing an offer to sell a product shall be made when the offer is not a bona fide effort to sell the advertised product.");

B. 940 Mass. Code Regs. § 3.02(2) ("No statement or illustration shall be used in any advertisement which creates a false impression of the grade, quality, make, value, currency of model, size, color, usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another.");

C. 940 Mass. Code Regs. § 3.02(3)(a) ("The refusal to show, demonstrate, or sell the product offered in accordance with the terms of the offer.");

D. 940 Mass. Code Regs. § 3.04 ("No claim or representation shall be made by any means which has the capacity or tendency or effect of deceiving buyers or prospective buyers as to the value or the past, present, common or usual price of a product, or as to any reduction in price of a product, or any saving relating to a product.");

E. 940 Mass. Code Regs. § 3.05(1) ("No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect.");

F. 940 Mass. Code Regs. § 3.05(2) ("No advertisement shall be used which would mislead or tend to mislead buyers or prospective buyers, through pictorial representations or in any other manner, as to the product being offered for sale. Where price is featured in advertising, any picture or

depiction utilized in connection therewith, shall clearly indicate the exact product being offered for sale at the advertised price.");

G. 940 Mass. Code Regs. § 3.13(2) ("No claim or representation shall be made which represents or implies, in advertising or otherwise, that a product or service may be purchased for a specified price when such is not the case");

H. 940 Mass. Code Regs. § 3.16(2) ("Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c.93A, § 2 if[ a]ny person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction");

I. 940 Mass. Code Regs. § 3.16 (4) ("Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c.93A, § 2 if[ i]t violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes").

123. Sonesta engaged in unfair, unlawful, and deceptive acts in trade and commerce, which had the capacity and tendency to deceive and did deceive Plaintiff and the Class members and damaged Plaintiff and the Class members.

124. Sonesta represented that Travel Pass rewards members could reserve hotel rooms at a certain nightly rate. Plaintiff and the Class members relied on these representations when selecting their rooms and completing their transactions.

125. However, the initially advertised price was not the actual price of the rooms Sonesta was providing to its Travel Pass rewards members. Instead, Sonesta's actual nightly rates were significantly higher because it added mandatory junk fees.

126. Defendant's deceptive acts, misrepresentations, and omissions were and are material, in that they were likely to, and did in fact, mislead reasonable Travel Pass rewards members acting reasonably under the circumstances.

127. Sonesta committed an unlawful, deceptive, and unconscionable trade practice by misrepresenting the price of its hotel rooms to induce Travel Pass rewards members into reserving more expensive rooms than they otherwise would have reserved.

128. The deceptive and unlawful trade practices complained of herein occurred primarily and substantially within the Commonwealth. Sonesta designed, operated, and maintained the purchase flow that deceived millions of Travel Pass rewards members from its corporate headquarters in Massachusetts.

129. Sonesta knowingly and willingly committed these deceptive acts and practices for its own profit and for the profit of its shareholders.

130. As a direct and proximate result of Sonesta's deceptive actions, Plaintiff and the Class members have been harmed and have lost money or property in the amount of the undisclosed, extra-contractual mandatory fees that they paid to Sonesta. Further, to the extent any putative class member was aware that Sonesta charged Junk Fees, they have suffered a cognizable injury by being required to expend additional (and unnecessary) time learning the actual price of Sonesta's rooms. *Kahn v. Walmart Inc.*, 107 F.4th 585, 601 (7th Cir. 2024).

131. Sonesta's actions were the direct, foreseeable, and proximate cause of the damages that Plaintiff and the Class members have sustained from having paid for and consumed Sonesta's services.

132. As a result of Sonesta's deceptive actions and practices, Plaintiff and the Class members have suffered damages and are entitled to recover those damages. Plaintiff and the Class members are also entitled to an injunction to prevent Sonesta from returning to its deceptive practices and to initiate a program to provide refunds and/or restitution to Plaintiff and the Class members.

133. On October 24, 2025, Plaintiff sent a written demand for relief, which identified the claimant and reasonably described the unfair or deceptive act or practice relied upon and the injury suffered. Mr. Isaacson demanded relief for himself and all others similarly injured by Sonesta's unfair and deceptive practices.[27] Sonesta has failed to provide the relief demanded therein.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff Isaacson, individually and on behalf of all Class Members proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and against Sonesta as follows:

a. Permanently enjoining Sonesta from advertising rates for hotel rooms that exclude mandatory resort, destination, and/or other similar fees;

[27] *See* Mass. Gen. Laws ch. 93A § 11 ("Any persons entitled to bring such action may, if the use or employment of the unfair method of competition or the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons[.]").

b. Permanently enjoining Sonesta from partitioning advertised hotel room prices from mandatory resort, destination, and/or other similar fees, including discontinuing the practice of placing these mandatory fees under a "Taxes & Fees" heading at checkout;

c. Awarding Plaintiff and the Class members the greater of actual damages trebled or statutory damages pursuant to ch. 93A § 9(3);

d. Awarding Plaintiff and the Class members punitive damages as determined by the trier of fact as Sonesta's actions were replete with malice and were accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, and willful disregard of the Class members' rights as described above;

e. Awarding prejudgment interest on all amounts awarded;

f. Granting an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

g. Granting any additional relief, as may be necessary, to restore Plaintiff and the Class members' money, which has been acquired by means of Sonesta's unlawful trade practices; and

h. For all other Orders, findings, and determinations identified and sought in this Complaint.

**JURY DEMAND**

Mr. Isaacson, on behalf of himself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

[signatures on following page]

DATED: January 26, 2026

Respectfully Submitted,

/s/ *Katherine M. Aizpuru*

Katherine M. Aizpuru (BBO #690383)
Hassan A. Zavareei (*pro hac vice* forthcoming)
Robert M. Devling (*pro hac vice* forthcoming)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave., N.W., Suite 1010
Washington, D.C. 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
kaizpuru@tzlegal.com
hzavareei@tzlegal.com
rdevling@tzlegal.com

F. Peter Silva II (*pro hac vice* forthcoming)
**TYCKO & ZAVAREEI LLP**
333 H Street, Suite 5000
Chula Vista, CA 91911
Telephone: (510) 254-6810
Facsimile: (202) 973-0950
psilva@tzlegal.com

*Counsel for Plaintiff and the Proposed Class*